**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SEPANTA JALALI, | : | |
| | : | **Case No. 2:20-cv-5071** |
| Plaintiff, | : | |
| | : | **CHIEF JUDGE ALGENON L. MARBLEY** |
| v. | : | |
| | : | **Magistrate Judge Deavers** |
| UNUM LIFE INSURANCE COMPANY | : | |
| OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

## OPINION & ORDER

This matter is before the Court on the parties' cross Motions for Judgment on the Administrative Record. (ECF Nos. 16, 19). Having reviewed this matter and concluding that these motions are appropriate for resolution without oral argument and for the reasons set forth below, Defendant's Motion for Judgment on the Administrative Record (ECF No. 19) is **DENIED** and Plaintiff's Motion (ECF No. 16) is **GRANTED IN PART**.

## I.    BACKGROUND

### A.  Factual Background

Plaintiff Sepanta Jalali worked as a family practice resident physician with Mount Carmel until November 2008. (ECF No. 16 at 7; ECF No. 19 at 8)). She participated in Trinity Health's, via Mount Carmel, long-term disability plan. (ECF No. 1 at 1; ECF No. 16 at 6; ECF No. 19 at 8). Defendant, Unum Life Insurance Company of America ("Unum"), serves as the insurer of the long-term disability plan for Mount Carmel employees. (*See* ECF No. 19 at 1.). A year prior, while Plaintiff was still in medical school, she suffered severe injury in a car accident. (ECF No. 16 at 7). That accident, in addition to the subsequent required surgeries, is the underlying basis for her inability to work. (*Id.*).

1

Moreover, the litigants here are no strangers to this Court.  Indeed, over the past decade Plaintiff and Defendant have had three separate actions, including the case sub judice, in this Court.

***Jalali I***.  Following Unum's termination of Plaintiff's Long-term Disability benefits in 2012, Plaintiff brought suit in this Court for the first time, seeking judicial review of Unum's decision.  (ECF No. 16 at 6).  On March 24, 2014, this Court granted Jalali's Motion for Judgment on the Administrative Record and Denied Unum's, holding that Unum's decision was arbitrary and capricious.  (*Id.*) (citing *Jalali v. Unum Life Ins. Co. of Am.*, No. 2:12- CV-00828, 2014 WL 1212708 (S.D. Ohio Mar. 24, 2014) (Marbley, J.), *appeal dismissed* (July 9, 2014) ("*Jalali I*").

***Jalali II***.  Two years later, Plaintiff filed another Complaint in this Court against Unum.  This time, she sought equitable relief under 29 U.S.C. § 1132(a)(3) with respect to a settlement she secured in connection to the 2007 car accident.  (ECF No. 19 at 11) (citing *Jalali v. Unum Life Ins. Co. of Am.*, No. 2:16-CV-512, 2018 WL 4468207, at *1 (S.D. Ohio Sept. 18, 2018) (Marbley, J.) ("*Jalali II*").  Instead of disputing whether Plaintiff was disabled, the litigants argued over a different aspect of Unum's Long-term disability Plan: whether Unum was entitled to the proceeds of the settlement Plaintiff received.  (*See id.*).  Because Unum believed that it was entitled to such monies, it reduced Plaintiff's monthly benefit in kind.  (*Id.*).  In response, Plaintiff filed suit.  Ultimately, this Court found that the Plan did not conclusively demonstrate that Unum was entitled to the proceeds of the settlement; denied both parties Motions for Summary Judgment; and remanded the matter to Unum for additional fact-finding.  *Jalali II*, 2018 WL 4468207, at *7.  The parties subsequently settled.  (ECF No. 19 at 11).

***Jalali III***.  On February 14, 2018, Unum again decided to terminate Plaintiff's long-term disability benefits.  (ECF No. 19 at 6; ECF No. 13-7 at 444).  This time, the litigants argue over whether Plaintiff is totally disabled under the Plan.  (*See* ECF No. 13-7 at 445).  Unum asserts that

"Dr. Jalali is able to perform the duties of other gainful occupations … [and is therefore] not disabled under the policy."  (*Id.*).  This decision, although made in early 2018, is based upon information Unum began gathering approximately a year before.  (*See* ECF No. 13-6 at 498).

As a part of its continuing benefit review, Unum requested certain information from Jalali in late 2016.  (*Id.* at 478).  Because of, at least in part, some miscommunication, Jalali did not disclose the requested information until March of 2017. At that time, Jalali faxed a completed Disability Status Update form to Unum. (*Id.* at 498).  Among other things, she noted she had received an online degree since she stopped working and that her treating physician was Dr. James Natalie.  (*Id.*).  Later that same month, Dr. Natalie also provided information pursuant to Unum's Disability Status Update request.  (ECF No. 13-7 at 7).

There, Dr. Natalie noted under the Functional Capacity section of the form, that Jalali had several restrictions.  (*Id.* at 8).  He noted that Jalali could seemingly, at most: frequently sit, occasionally stand and/or walk, and that she should only, if at all, lift or carry items in the 10 to 15lb range occasionally.  (*Id.*).  Unum followed up with Dr. Natalie in late May of 2017, sending him an additional form; the relevant portion is excerpted below:

At this time, we need clarification regarding Sepanta Jalali's work capacity within the following occupational demands:

- Exerting up to 10 pounds of force occasionally and/or negligible amount of force frequently to lift, carry, push or otherwise move objects, including the human body.
- Sedentary work involves sitting most of the time, but may involve walking, standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met. Ability to change positions as needed throughout the work day.

Please answer the following:

- Is Sepanta Jalali able to perform the above occupational demands on a full-time basis?

Yes____  No ____ If yes, as of what date? _____

If no, please explain.

On May 31, 2017, Dr. Natalie responded by filling out, signing, and returning the form to Unum.  This completed form is excerpted below:

At this time, we need clarification regarding Sepanta Jalali's work capacity within the following occupational demands:

- Exerting up to 10 pounds of force occasionally and/or negligible amount of force frequently to lift, carry, push or otherwise move objects, including the human body.
- Sedentary work involves sitting most of the time, but may involve walking, standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met. Ability to change positions as needed throughout the work day.

Please answer the following:

- Is Sepanta Jalali able to perform the above occupational demands on a full-time basis?

  Yes ✓  No ___  If yes, as of what date? _____

  If no, please explain.

(ECF No. 13-7 at 52).  Notably, when asked if Jalali could perform the above-detailed tasks on a full-time basis, Dr. Natalie answered in the affirmative.

In July of 2017, Unum reached out to Jalali's other treating physician: neurologist Dr. Barfield.  (ECF No. 13-7 at 212). There, Unum requested records detailing the treatment Dr. Barfield rendered.  (*See id.* at 215).  The records showed that Dr. Barfield treated Jalali with Botox injections for refracting headaches following a second car accident in 2015.  (*See id.* at 231). Following her April 7, 2017 office visit, Plaintiff reported significant improvement regarding the "reduction in her headache frequency, severity, and duration."  (*Id.* at 217, 241, 271).

In February of 2018, Unum contacted both Drs. Barfield and Natalie. Dr. Barfield informed Unum that Jalali was receiving treatment, but apparently provided no restrictions or limitations. (*See id*. at 428).  Dr. Natalie, when asked about his prior statement that Jalali could perform sedentary work, stood by his previous conclusion.  (*Id.* at 429).  Following the receipt of this

information, Unum communicated to Jalali that it was terminating her LTD benefits.  (*Id.* at 444).

Jalali, through counsel, filed an appeal of Unum's decision in October 2018.  (ECF No. 13-9 at

110).  Little more than a month later, on November 29, 2020, Unum upheld its termination of

benefits.  (*Id.* at 103).

     As a part of the appeal process, Jalali submitted the results of a Functional Capacity

Evaluation (FCE), an independent medical exam (IME), and a vocational report.   Additional

relevant portions of the administrative records are as follows:

- **Defendant's File Review (Dr. Fox):**  On October 4, 2017, Dr. Fox completed his file

  review.   There, he asserted that in his opinion, restrictions and limitations were not

  supported.  (ECF No. 13-7 at 294).  Dr. Fox opined that although "the imaging findings

  include the potential for neural compromise, recent examinations have not" been consistent

  with this conclusion.  (*See id.* at 295). Moreover, he based in decision, in part, on his finding

  that no attending physician was "supporting R&L [restrictions and limitations] precluding

  work capacity."  (*See id.*).  Finally, Dr. Fox found that if Plaintiff is provided a job "with

  the ability to change positions as needed throughout the workday," she would not be

  precluded from such work.  (*See id.* at 297).

- **Independent Medical Exam (IME) at Defendant's request:** On January 2, 2018, Dr.

  Eugene Lin performed an Independent Medical Exam at Defendant's request.  Specifically,

  Dr. Lin opined he believed the IME demonstrated that "the claimant would be able to

  perform work withing the expectations of exertion up to 10 pounds constantly, sitting most

  of the time with brief periods of standing and walking with ability to change positions as

  needed throughout the workday." (ECF No. 13-7 at 409).  Dr. Lin reached this conclusion

  because he "found no physical findings consistent with Dr. Jalali's reported radicular

symptoms and documents negative lumbar provocative tests." (ECF No. 13-9 at 105). Put differently, Dr. Lin concluded that Jalali "would be able to return to work in a sedentary full time fashion within the restrictions stated." (*Id.* at 410).

- **Functional Capacity Evaluation (FCE):** On July 10, 2018, Mr. Scott Secrest performed a functional capacity evaluation on Jalali. There, Secrest opined that Jalali's condition prevented her from participating in "competitive employment … even within a sedentary work environment." (ECF No. 13-8 at 70). Further, Secrest found that Jalali "[f]or all practical purposes, … demonstrates sub-sedentary capacity as she is unable to perform all material handling tasks with at least 10 lb." (*Id.*). Additionally, Secrest found that Jalali was "unable to tolerate sitting uninterrupted for more than approximately 20 minutes," in part because she frequently demonstrated the need for "offloading of the spine through counterforce of the hands and arms on the arm rests." (*Id.*).

- **Independent Medical Exam (IME) at Plaintiff's request:** On October 4, 2018, Dr. Alex Minard performed an independent medical examination. There, Dr. Minard opined that Jalali "is totally and permanently disabled from any employment." (ECF No. 13-8 at 265). Dr. Minard supported this opinion by finding that Jalali is "limited in her ability to mobilize, bend, reach, lift and carry." (*Id.*). This finding, in part, was based on his assessment that "Jalali had grade II to grade III chrondomalacia in her knee" that was "caused by her first motor vehicle accident." (ECF No. 13-9 at 107). Moreover, Dr Minard found that Jalali presented "with an abnormal gait and hip weakness making her a fall risk in any work environment." (ECF No. 13-8 at 265). Finally, Dr. Minard found Jalali to be credible and that this finding, in addition to the foregoing, was consistent with her FCE. (*Id.* at 265–66).

- **Vocational Report at Plaintiff's request:** On October 4, 2018, Mr. Joseph Atkinson provided his vocational report. There, after reviewing almost all of the available administrative record, he opined that "Dr. Jalali has a poor prognosis for return to work and is functioning poorly.  The consultant feels the medical does not support the ability to work in any capacity on a full time basis."  (ECF No. 13-8 at 275).

- **Defendant's File Review (Dr. Norris):**  On November 2, 2018, Dr. Norris completed his file review.  (ECF No. 13-9 at 65).    There, he asserted that in his opinion, restrictions and limitations were not supported.  (*See id.* at 68).  Dr. Norris opined, *inter alia*, "[n]one of the insured's treating physicians opined R/Ls [restrictions and limitations] that would preclude her from performing sedentary work as of the claim closure." (*Id.*).  Indeed, when noting that Jalali suffered from degenerative lumbar disease as of 2010, he then noted that in 2017, her doctor "agreed that she could perform full time sedentary level work."  Further, because no other attending physicians were "opining R/Ls," Dr. Lin's January 2018 IME was consistent with this conclusion.  (*See id.*)  Importantly, Dr. Norris provided this opinion based on the condition that Jalali would be able "to change position throughout the workday."  (*Id.*).

Unum's long term disability policy's definition of "Total Disability" is when a claimant is "limited from performing the material and substantial duties of [claimant's] regular occupation due to [claimant's] sickness or injury; and [the claimant has] a 20% or more loss in [claimant's] indexed monthly earnings due to the same sickness or injury."  (ECF No. 13-7 at 447).  Moreover, "[a]fter 24 months of payments, [the claimant is] disabled when Unum determines that due to the same sickness or injury, [the claimant is] unable to perform the duties of any gainful occupation for which [the claimant is] reasonably fitted by education, training or experience."  (*Id.*).

### B. Procedural Background

On September 28, 2020, Sepanta Jalali filed her Complaint against UNUM Life Insurance Company of America asserting that its denial of her long-term disability claim was in violation of the Employment Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B). (ECF No. 1). Defendant filed an Answer on November 24, 2020. (ECF No. 5). On May 17, 2021 and June 22, 2021, the parties filed cross-motions for judgment on the Administrative Record. (ECF Nos. 16, 19). Plaintiff filed her Response in Opposition on October 22, 2021. (ECF No. 29). Defendant filed its Reply on November 22, 2021. (ECF No. 30). The motions are ripe for adjudication.

## II.     STANDARD OF REVIEW

This Court reviews an ERISA plan administrator's termination of benefits *de novo* "unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits." *Cox v. Standard Ins. Co.*, 585 F.3d 295, 299 (6th Cir. 2009). If the benefit plan gives the administrator discretionary authority to determine eligibility for benefits, the Court reviews the administrator's decision under the highly deferential "arbitrary and capricious" standard of review. *Id.*

Plaintiff does not dispute that UNUM is entitled to the more deferential "arbitrary and capricious" standard but argues that this Court's review of UNUM's decision should be "tempered" by the fact that UNUM is operating under "structural conflict" since UNUM pays the disability claims and decides who is entitled to receive payment. (ECF No. 16 at 16). The inherent conflict of interest of a dual-role insurer like UNUM is considered as a factor in this analysis, but it does not alter or displace the "arbitrary and capricious" standard of review altogether. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–16 (2008); *see also Cox*, 585 F.3d at 299 ("In close

cases, courts must consider that conflict as one factor among several in determining whether the plan administrator abused its discretion in denying benefits.").

Under this deferential standard of review, when a plan administrator offers a "reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quoting *Perry v. United Food & Workers Dist. Unions 445 & 442*, 64 F.3d 238, 241 (6th Cir. 1995)). Put differently, the Court should consider whether UNUM's decision to deny Plaintiff's benefits was "the result of a deliberate, principled reasoning process ... supported by substantial evidence." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006). Although the Court's review is deferential, "it is not a rubber stamp for the administrator's determination." *Id.* ("[D]eferential review is not no review."). Finally, the Court is confined to examination of the administrative record. *Farhner v. United Transp. Union Discipline Income Prot. Prog.*, 645 F.3d 338, 343 (6th Cir. 2011).

### III.    LAW & ANALYSIS

Plaintiff asserts numerous bases for its conclusion that Defendant's denial of her benefits is arbitrary and capricious. First, Plaintiff argues that Defendant failed to produce any evidence demonstrating that Plaintiff's condition previously resulted in a finding of Total Disability has improved. Second, Plaintiff contends that Defendant improperly failed to consider and credit its Functional Capacity Exam (FCE). Third, Plaintiff maintains that Defendant, in violation of the Plan's language, considered whether Plaintiff could perform some occupations with an accommodation. Fourth, Plaintiff argues that Defendant did not consider Plaintiff's affidavit and unreasonably ignored this evidence. Fifth, Plaintiff argues that Defendant bases its decision to deny her benefits, largely on the deficient opinion of Dr. Lin. Finally, Plaintiff asserts that Defendant, because of its dual role as payor and decider, has a conflict; thus, its decision to deny

9

benefits should be viewed with skepticism.  Based on these grounds for overturning Defendant's denial, Plaintiff argues that this Court should order Defendant to pay Plaintiff's benefits, in addition to ordering that a subsequent denial of benefits be subject to a heightened decisional standard: Defendant would need to show with reasonable and objective evidence that she is not disabled.

It is undisputed that the first 24-month period of the plan as described above has passed. (ECF No. 13-7 at 448) ("Dr. Jalali's Long Term Disability claim was paid for the first 24 months because her medical records supported her inability to perform her occupation as a Resident Physician due to her low back pain.").  Accordingly, the parties only disagree about Plaintiff's disability status as defined following the initial 24-month period. Thus, the sole dispute is whether Plaintiff is disabled as defined within Unum's Plan as to her ability to perform "any gainful occupation".  (*Id.*).  The term "gainful occupation" is defined as "an occupation that is or can be expected to provide [the claimant] with an income within 12 months of … return to work, that exceeds" a certain percentage of claimant's monthly "indexed earnings."

The Sixth Circuit recognizes "many of these factors as potentially indicative of arbitrary-or-capricious decision making." *See Cook v. Prudential Ins. Co. of Am.*, 494 Fed. Appx. 599, 604–05 (6th Cir. 2012); *Zenadocchio v. BAE Sys. Unfunded Welfare Benefit Plan*, 936 F.Supp.2d 868, 886–93 (S.D. Ohio 2013). Therefore, this Court will consider each of Jalali's arguments, while acknowledging that "[t]he ultimate issue ... is not whether discrete acts by the plan administrator are arbitrary or capricious but whether its ultimate decision denying benefits was arbitrary and capricious."  *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quotation omitted).

## A.  Conflict of Interest

Plaintiff argues, in part, that because Defendant has an inherent Conflict of Interest as payor and plan administrator, Defendant's decision to terminate her benefits is arbitrary and capricious. (ECF No. 16 at 24–25).  Although not argued first, the Court considers this argument at the outset because a finding of conflict contextualizes its application of the deferential standard.  *See Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 260 (6th Cir. 2006) (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 293 (6th Cir. 2005) (noting that while "the standard remains unchanged … the conflict of interest is to be considered in *applying* that standard.") (emphasis in original).

First, relying on *Haning v. Hartford Life & Accident Ins. Co.*, 140 F. Supp. 3d 654, 674 (S.D. Ohio 2015), Plaintiff asserts Defendant is conflicted, and argues that this finding is relevant to the Court's analysis of Defendant's decision to terminate benefits.  (*See* ECF No. 16 at 24–25). According to Plaintiff, although how the reviewing Court should weigh the conflict is fact specific, in some instances it can rise to the level of "taint[ing] the entire decisionmaking process." (*Id.*) (citing *Chinn v. AT&T Umbrella Ben. Plan No.1*, No. CIV. 12-88-GFVT, 2013 WL 5468501, at *5 (E.D. Ky. Sept. 30, 2013) and *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009) (citations omitted)).  Here, Plaintiff urges this Court to consider: (1) the value of her claim; (2) the number of times her benefits have been terminated; (3) the clear bias of Dr. Lin; and (4) Defendant's history of bias.  (*Id.* at 25–27).

Defendant rejoins by noting that Plaintiff provides no concrete evidence to support her allegations of bias.  (ECF No. 19 at 33).  Instead, according to Defendant, Plaintiff relies on a series of unrelated facts, a mischaracterization of the parties' transactional history, and a mischaracterization of Defendant's claim processing history to support her theory.  (*Id.* at 33–37). Indeed, if Plaintiff had reason to believe that Defendant was biased, she could have sought limited discovery.  (*Id.* at 33).  Accordingly, Defendant says, this omission is glaring.  Moreover,

Defendant maintains that case law addresses the weight of allegations absent proof: it is simply insufficient to lodge such claims without evidence.  (*Id.* at 34) (citing *Thompson v. Transam Trucking, Inc.*, 750 F. Supp. 2d 871, 882–83 (S.D. Ohio 2010) (quoting *Cochran v. Trans-General Life Ins. Co.*, 12 F. App'x 277, 281 (6th Cir. 2001)).

While the Court employs here the "highly deferential "arbitrary and capricious" standard, [it] must take into consideration the fact that [Defendant] is acting under a potential conflict of interest because it is both the decision-maker, determining which claims are covered, and also the payor of those claims." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).  Under such circumstances, "the administrator's fiduciary interest in granting a valid claim may conflict with its financial one that results from a denial." *Fenwick v. Hartford Life & Accident Ins. Co.*, 457 F. Supp. 3d 603, 623 (W.D. Ky. 2020), *aff'd*, 841 F. App'x 847 (6th Cir. 2021).  That said, "while a plan administrator's dual role in both evaluating and paying benefits claims creates a p*er se* conflict of interest, that conflict of interest does not constitute a *per se* abuse of discretion." *Hays v. Provident Life & Acc. Ins. Co.*, 623 F. Supp. 2d 840, 843 (E.D. Ky. 2008).  Instead "a conflict of interest [is] merely one of the "several different considerations" the court should look to in determining the lawfulness of the administrator's denial of benefits." *Collins v. Unum Life Ins. Co. of Am.*, 682 F. App'x 381, 387 (6th Cir. 2017) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008)).

The Sixth Circuit has held that it assigns "more weight to the conflict in circumstances that suggest a higher likelihood that it affected the benefits decision." *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009).  Accordingly, "relevant circumstances include whether the administrator repeatedly retains the same physician … both decides claims and pays benefits … or uses in-house consultants. *Rothe v. Duke Energy Long Term Disability Plan*, 688

F. App'x 316, 319 (6th Cir. 2017) (citing *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440,

445 (6th Cir. 2009) and *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 393 (6th Cir. 2009)).

In *Rothe*, the Sixth Circuit chose to consider the plan administrator's conflict "in deciding

whether its decision was arbitrary and capricious," because it retained reviewing physicians,

decided the claim, would be responsible for paying benefits, and used an in-house vocational

expert." *Id.* Similarly, here, the plan administrator retained reviewing physicians (Dr. Lin),

decided the claim, was responsible for paying benefits, and used in-house physician consultants

(Drs. Fox, Norris) as well as a vocational expert. (ECF No. 13-9 at 105). While this Court declines

to adopt Plaintiff's theory that this conflict, on its own, provides a sufficient basis that Defendant's

decision was arbitrary and capricious, this Court, relying on *Rothe*, notes that these features must

be considered in the context of whether Unum's decision "constitute[d] reasoned decision-making

process." *Rothe*, 688 F. App'x at 319, 321.

### B. Interpreting the Plan

Plaintiff also asserts that Defendant misinterpreted the Plan when it determined that

Plaintiff was no longer Totally Disabled. (ECF No. 16 at 20). Plaintiff's primary support for this

assertion is that Unum's disability determination is based on its finding that a hypothetical

employer could accommodate Plaintiff. (*Id.*). According to Plaintiff, since Defendant could not

make disability determinations based on such considerations, Defendant's subsequent decision to

terminate benefits is necessarily arbitrary and capricious. (*Id.* at 22). Plaintiff's argument stems

from the undisputed fact no such "reasonable accommodation" requirement within the Plan exists.

(*See id.* at 20). Plaintiff points out that although some Plans do expressly include a condition that

allows for accommodations, the Plan here does not. (*Id.* at 21). Additionally, Plaintiff argues that

reaching such a conclusion would not be unreasonable had an employer actually expressed a

willingness to provide an accommodation; yet, this has not occurred. (*Id.*). Finally, even if this occurred, the occupational professionals expressly stated that Plaintiff's restrictions cannot be accommodated. (*Id.*). Thus, Plaintiff believes not only are the accommodations arguments raised by Unum foreclosed by the Plan's own terms, those arguments are irrelevant in light of the opinions of Plaintiff's own occupational consultants (*Id.*).

Defendant responds by disputing Plaintiff's characterization of its analysis. Defendant argues, it did not import an accommodation standard; instead, Defendant simply made considerations attendant with a routine "any gainful occupation" analysis. (ECF No. 19 at 26–27). Indeed, Defendant argues, Plaintiff misconstrues the case law upon which she relies. (*Id.* at 27). According to Defendant, *Tenney v. BankAmerica Corp. Employee Benefits Administrative Committee* , on which Plaintiff relies was subsequently clarified to hold that when performing an "any gainful occupation analysis[,]" administrators may consider a reasonable accommodation. (*Id.*) (citing No. 98-16200, 1999 U.S. App. LEXIS 16024 (9th Cir. July 13, 1999)). Defendant contends that similar examinations failing to consider such accommodations may be deficient. (*Id.* at 28) (citing *Bustetter v. Standard Ins. Co.*, 529 F. Supp. 3d 693, 705 (E.D. Ky. 2021), *aff'd*, No. 21-5441, 2021 WL 5873159 (6th Cir. Dec. 13, 2021)). And, just because other benefit plans explicitly allow for administrators to consider reasonable accommodations, that does not necessarily mean that administrators are barred from doing so when the plan is silent. (*Id.*).

First, it is important to further explain what the litigants mean by consider "reasonable accommodations." *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 541–42 (6th Cir. 2015), where the plan being examined provided eligibility standards for long-term disability benefits, explained:

> To be eligible for such benefits, an employee must have "an illness
> or injury, other than accidental injury arising out of and in the course

14

> of employment by the Company or a Participating Company, supported by objective Medical Documentation." Further, "[s]uch illness or injury [must] prevent[ ] [him] from engaging in any occupation or employment (with reasonable accommodation as determined by the Claims Administrator), for which [he is] qualified or may reasonably become qualified based on education, training or experience." (*Id.*)

*Id.* Thus, the plain language of the plan allowed the administrator to consider reasonable accommodations when determining whether a claimant was disabled within the meaning of the plan. *Id.*

Although Defendant argues that a Plan administrator may consider reasonable accommodations when doing an "any occupation" analysis under an ERISA plan, it has provided, and the Court found no controlling authority on this narrow question. (*See* ECF No. 19 at 28). And while this specific point of law appears to be still undecided, as discussed below, Supreme Court and Sixth Circuit jurisprudence provides clear guidance on how to interpret plan language. Furthermore, adopting the rule that Defendant attempts to advance—allowing plan administrators to consider things that are otherwise not mentioned in the plan—would not only violate this jurisprudence, it would also go against the great weight of the bedrock principles of ERISA.

The Supreme Court has recognized "[t]he contractual terms of an ERISA policy 'should be enforced as written.'" *Kennedy v. Life Ins. Co. of N. Am.*, 262 F. Supp. 3d 481, 490 (W.D. Ky. 2017), *aff'd*, 718 F. App'x 409 (6th Cir. 2018) (quoting *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013)). "The plan, in short, is at the center of ERISA." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013), and "[e]mployers have large leeway to design disability and other welfare plans as they see fit." *Heimeshoff*, 571 U.S. at 108 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003)). Accordingly, "once a plan is established, the

administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument.'" *Id.* (citing 29 U.S.C. § 1102(a)(1)).

Consistent with the Supreme Court's guidance, the Sixth Circuit has recognized that "Congress intended ERISA plans to 'be uniform in their interpretation and simple in their application.'" *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 890–91 (6th Cir. 2020) (citing *Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 934 (6th Cir. 2000)). Accordingly, "[i]n interpreting the provisions of a plan, a plan administrator must adhere to the plain meaning of its language, as it would be construed by an ordinary person." *Id.* (citing *Shelby Cty. Health Care Corp*, 203 F.3d at 934). To the degree the plan's terms are ambiguous—i.e., "subject to two reasonable interpretations," *Schachner v. Blue Cross & Blue Shield*, 77 F.3d 889, 893 (6th Cir. 1996), such ambiguities are resolved in the insured's favor. *See id.* (citing *Firestone*, 489 U.S. at 113, 109 (citations omitted); *Wallace*, 954 F.3d at 890–91 ("Resolving ambiguities in the insured's favor also accords with ERISA's goals to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits.") (internal quotations omitted).

Here, the plan does not discuss reasonable accommodations in its definition of disability. (*See* ECF No. 13-7 at 447–449). As such, the plain language of the plan does not allow for this consideration when the administrator is determining if a claimant is disabled within the meaning of the plan. (*See id*). To insist otherwise, of course, is to create an ambiguity where there is none. *See In re Campbell*, 116 F. Supp. 2d 937, 948 (M.D. Tenn. 2000), *aff'd sub nom. Hildebrand v. Fortis Benefits Ins. Co.*, 70 F. App'x 798 (6th Cir. 2003) ("This Court will not artificially create ambiguity were [sic] none exists. If a reasonable interpretation favors [one party] and any other interpretation would be strained, no compulsion exists to torture or twist the language of the

policy.") (citations and internal quotations omitted).  Thus, either interpretative approach—plain language or attempting to read in an absent provision, fails for Defendant.

Importantly, Defendant's inability to provide significant support for this rule bolsters this approach.  In its briefing, Defendant relies on one lone district court decision within the Sixth Circuit that has approved the consideration of reasonable accommodations, at least within the limited scope of performing an FCE.  (ECF No. 19 at 28) (citing *Bustetter*, 529 F. Supp. 3d at 705). Moreover, despite Defendant's insistence to the contrary, in light of the interpretative approach required by the Supreme Court and the Sixth Circuit, Unum's silence is persuasive.  Indeed, it is particularly so in the face of other Plans expressly allowing administrators to consider reasonable accommodation: the two facts together strongly suggest Unum never intended to include this newly discovered provision.

As courts have acknowledged, "an administrator lacks discretion to rewrite the Plan." *Pelchat v. UNUM Life Ins. Co. of Am.,* No. 3:02CV7282, 2003 WL 21105075, at *11 (N.D. Ohio Mar. 25, 2003) ("The policy does not condition benefits on clinical evidence of the existence of the condition that renders a claimant disabled. To construe plaintiff's policy to impose a requirement of "objective medical evidence" would rewrite the policy."); *see US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013) ("The statutory scheme, we have often noted, is built around reliance on the face of written plan documents.") (internal quotations omitted); *Wausau Benefits v. Progressive Ins. Co.*, 270 F. Supp. 2d 980, 988 (S.D. Ohio 2003) ("One of the primary purposes of ERISA is to ensure the integrity and primacy of the written plans.").  Indeed, this is precisely how the Supreme Court and the Sixth Circuit instruct how to resolve such interpretative issues. Thus, this Court rejects the plan administrator's assertion and finds that reading in such an additional requirement violates the plain language of the plan.  *Watson v. W. & S. Fin. Grp.*

*Flexible Benefits Plan*, 406 F. Supp. 3d 600, 611–12 (E.D. Ky. 2019) ("Western & Southern's argument is contrary to the Plan's language. The Plan does not define a disability as one which prevents a claimant from performing their job duties with an *accommodation.*") (emphasis in original).

More concerning, however, is that Defendant's misinterpretation appears to have vitiated the administrator's entire decision-making process.  Throughout its briefing as well as the administrative record, Defendant makes much of Plaintiff's treating physician's apparent opinion: Plaintiff may, subject to some restrictions and limitations perform work at a sedentary capacity. (*See* ECF No. 19 at 6–8, 10–11, 13, 15, 29, 31–32, 35, 39).  Plaintiff points out that Dr. Natalie's statement contains an odd caveat: Plaintiff would have the "[a]bility to change positions as needed throughout the workday."  (ECF No. 13-7 at 52).  This same condition, although not present in Unum's definition of disability in the plan, shows up throughout its forms and documentation. Notably, this phrase shows up in its questionnaire given to: (1) Plaintiff's treating physicians ("ability to change positions as needed throughout the day"); (2) the independent medical reviewer hired by Defendant, Dr. Lin ("with ability to change positions as needed throughout the work day"); and Defendant's own consulting physicians performing file reviews, Drs. Fox and Norris ("with the ability to change position throughout the workday").  (ECF No. 13-7 at 52, 297, 410; ECF No. 13-9 at 68).[1]  Additionally, Defendant's reviewers (Drs. Lin, Fox, and Norris) each explicitly relied on this condition when opining on Plaintiff's ability to perform sedentary work and expressed how their opinions were consistent with Plaintiff's treating physician's opinion. Thus, Defendant, by misinterpreting the plan from the outset of its continuing disability review

---

[1] The lone missing reference to this language is regarding Dr. Barfield's opinion.  Yet, there are two reasons to assume he was asked the same inquiry. First, there is no attending physician statement from Dr. Barfield as there is for Dr. Natalie. Instead,

facilitated the ability of its physicians to reach a conclusion supported by Plaintiff's doctor that was simply not germane to the plan.

To Defendant's credit, it concedes that "the ability to change positions is not part of the definition of 'sedentary capacity." (ECF No. 30 at 7). Instead, it asserts that it may "consider accommodations in the context of determining disability." (*Id.*). As stated above, however, this interpretation—including a new requirement the Plan admits is extrinsic to the definition—is simply too much for the plan's language to bear. Further, it appears that this misinterpretation was neither a one-off nor done unwittingly. This language was endemic to the administrator's decision process.

Even under the highly deferential standard of arbitrary and capricious, the discretion afforded to the administrator "does not include the authority to add eligibility requirements to the plan." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (finding the administrator's interpretation and subsequent denial of benefits arbitrary and capricious). Here, Unum misinterpreted the plan's language by adding an additional eligibility requirement to receive long-term disability benefits: namely, that Plaintiff must not only show that she is disabled but also has a disability that cannot be reasonably accommodated. Accordingly, because Unum "applied an arbitrary-and-capricious definition of the [relevant] term"—here, disabled—its decision to deny benefits based on that interpretation is also arbitrary and capricious. *See id.* at 665.

### C. Evidentiary Issues
#### i. *Improvement of Plaintiff's Condition*

Plaintiff argues that Defendant failed to produce any evidence that demonstrates that Plaintiff's condition—the same condition that previously resulted in a finding of Total Disability—has improved. (ECF No. 16 at 17). Moreover, Plaintiff, relying principally on *Kramer v. Paul Revere Life Insurance Company*, 571 F.3d 499 (6th Cir. 2009), argues that Defendant must adduce

such evidence in reaching its decision that Plaintiff is no longer entitled to benefits because of an improved condition.  (*Id.*).  Furthermore, Plaintiff maintains, that Defendant's reliance on a checkmark on an Attending Physician Statement (APS) form, on its own, is insufficient to find that she is no longer Totally Disabled.  (*Id.* at 18).

Defendant retorts that there is plenty of evidence of improvement within the record.  (ECF No. 19 at 22).  Moreover, Defendant argues that its decision to deny benefits cannot be construed as arbitrary and capricious solely for a failure to produce evidence of Plaintiff's improvement. (*See id.*).  Instead, Defendant, relying on *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010), maintains that such a failure is but one of a number of factors to consider.  (*Id.*).  Further, Defendant relies on *Godmar v. Hewlett-Packard Co.*, 631 F. App'x 397, 402 (6th Cir. 2015) (quoting *Morris*, 399 F. App'x at 984) for the proposition that the relevant question is whether the plan administrator had a rational basis for concluding that Plaintiff was disabled at the time of the benefit determination at issue.  (*Id.* at 23).  Nonetheless, Defendant maintains there is sufficient evidence in the administrative record to conclude such improvement. (*Id.* at 22).

Indeed, Defendant contends, Plaintiff's own treating providers gave Defendant a basis to find that her condition has improved.  (*Id.* at 23).  For example, Defendant points to Dr. Natalie's notes that there was nothing concerning about Plaintiff's knee in a physical exam.  (*Id.*). Additionally, Defendant argues, Dr. Minard's opinion absent explanation did not assist Defendant with its benefits determination.  (*Id.* at 24).  Beyond that, Defendant's reviewers also made findings consistent with its determination.  For example, Dr. Lin's IME and other Unum consultants found that Plaintiff is not precluded from working in a sedentary position.  (*Id.* at 23).  Dr. Fox reviewed the same medical information that Dr. Minard reviewed and reached this conclusion.  (*Id.*).

Additionally, Dr. Norris noted that although recent imaging results—a 2015 MRI—are consistent with past injury or surgery, they too do not support preclusion from full-time sedentary activity. (*Id.*).  Defendant also compares Plaintiff's current condition to the situation in *Jalali I*.  Finally, those imaging results actually show that Plaintiff's condition is improving.  (*Id.*).

A cancelation of existing disability benefits by a plan administrator may be reversed if the decision was not based on evidence of improvement.  *See Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499, 507 (6th Cir. 2009) ("Moreover, there is no explanation for the decision to cancel benefits that had been paid for some five years based upon the initial determination of total disability in the absence of any medical evidence that the plaintiff's condition had *improved* during that time.") (emphasis added); *see also McCollum v. Life Ins. Co. of N. Am.*, 495 F. App'x 694, 704 (6th Cir. 2012); *Caesar v. Hartford Life & Acc. Ins. Co.*, 464 F. App'x. 431, 436 (6th Cir. 2012).  Yet, such a finding, on its own, is not necessarily a sufficient basis to hold a plan administrator's termination of benefits arbitrary and capricious.  *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010) (noting that in some instances, improvement need not be shown, particularly if the job category is one where the Plaintiff is not considered disabled.).  Indeed, "the ultimate question is whether the plan administrator had a rational basis for concluding that [the claimant] was not disabled at the time of the new decision." *Godmar*, 631 F. App'x at 402 (citing *Morris*, 399 F. App'x. at 984).

Here, Defendant contacted Plaintiff's treating physicians as a part of its disability benefits review.  Defendant first contacted Dr. Natalie and solicited his opinion regarding Plaintiff's ability to work in a sedentary capacity, to which Dr. Natalie responded in the affirmative. Yet, the thrust of this opinion is obscured by lack of context.  To that end, it is important to note that however the parties define improvement, the relevant inquiry is improvement in terms of occupational capacity.

That is, Plaintiff contends that her occupational capacity—based on medical evidence—has not improved; Defendant argues the opposite. Importantly, however, Defendant omits the fact that when it solicited opinions from Drs. Natalie, Lin, Fox and Norris regarding Plaintiff's occupational capacity, the Defendant asked if Plaintiff was totally disabled but would have the "[a]bility to change positions as needed throughout the workday." Notably, the plan's language does not provide for this accommodation. Thus, the improvement Defendant appears to argue that is supported by medical opinion is in Plaintiff's ability to perform a sedentary job with the accommodation requirement. Accordingly, based on Defendant's flawed interpretation of its own plan, its arguments that Plaintiff has improved, viewed through this contextual lens, ring hollow.

Because Sixth Circuit case law does not require a defendant to demonstrate a plaintiff's improvement in the general sense, Defendant's inability to do so here is not fatal. Defendant's reliance on opinions based upon a different inquiry, however, is more concerning. Thus, Defendant's failure to demonstrate improvement does not render its decision arbitrary and capricious, but instead sheds light on the impact of adding a requirement to the plan's definition.

### ii.    Consideration of FCE

Next, Plaintiff argues that Defendant did not properly consider the FCE. Plaintiff asserts that Defendant disregarded this evidence, largely, because of timing; its own mischaracterizations of the FCE; and an apparent misapprehension of what sedentary work compels. (ECF No. 16 at 18–19). Plaintiff contends that the Defendant discounted its FCE because it was dated 5 months after its initial denial. (*Id.* at 18). Second, Plaintiff maintains that mischaracterized premises undermine Defendant's decision making. For example, according to Plaintiff, Dr. Natalie, despite Defendant's insistence, is not Plaintiff's long-time provider. (*Id.*). Beyond that, Plaintiff argues, even if the FCE and the physician reports conflicted—which they did not—the FCE is the gold

standard and should be accorded additional weight. (*Id.* at 19). Finally, Plaintiff says, Defendant's reviewers rendered internally inconsistent conclusions. Specifically, Mr. Phillips in his opinion conceded what such work would require, failed to challenge the part of the report noting that Plaintiff had a restriction that would undermine her ability to do such work, and then concluded she was not precluded from sedentary work. (*See id.* at 19–20).

Defendant rejoins that it properly considered and weighed the FCE. Defendant argues that it did not discount the FCE because of its timing; instead, it discounted the FCE because it was inconsistent with the findings of Plaintiff's treating providers and Dr. Lin's IME. (ECF No. 19 at 24). Moreover, according to Defendant, the characterization of Dr. Natalie's relationship is a red herring; its relevance to the overall decision is minimal. (*Id.* at 25). Finally, despite Plaintiff's protests, an FCE does not necessarily hold more evidentiary weight than Plaintiff's own treating providers and the Defendant's physician consultants and other reviewers. (*Id.* at 25–26).

Although "plan administrators are not obliged to accord special deference to the opinions of treating physicians," *Shaw v. AT & T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003)), "they may not arbitrarily refuse to credit a claimant's reliable evidence." *Id.* (citing *Black & Decker Disability Plan*, 538 U.S. at 834) (internal quotations omitted). Moreover, the Functional Capacity Evaluation "is generally a reliable and objective method of gauging the extent one can complete work-related tasks." *Id.* (citing *Caesar v. Hartford Life & Accident Ins. Co.*, 464 Fed. App'x. 431, 435 (6th Cir. 2012) (internal quotation marks omitted) and *Brooking v. Hartford Life & Accident Ins. Co.*, 167 Fed. App'x. 544, 549 (6th Cir. 2006)).

While Plaintiff asserts that the FCE is the gold standard, relying on *Huffaker v. Metro. Life Ins. Co.*, 271 F. App'x 493, 500 (6th Cir. 2008), Defendant responds noting that it is simply one

method, among many, that provides "objective proof of disability," citing the same case. *Id.* Yet, the absolute weight of an FCE—gold standard or not—is less important than whether the Defendant discounted this evidence for improper reasons. Based on its own denial letter, Defendant discredits the FCE because it asserts that the report "does not address the demands of the **specific sedentary occupations** identified by the Benefits Center." (ECF No. 13-9 at 106) (emphasis added).

The reasoning offered by Defendant to reject, or at least minimize, the FCE is concerning. For one, the denial letter seems to rely significantly on the assumption that Plaintiff would be able "to change positions on an as needed basis." (*Id.* at 111). This, of course, is a clear reference to the reasonable accommodation standard that Defendant impermissibly interpreted as included in its definition of disability. Again, the Defendant is moving the goalposts at the eleventh hour.

Specifically, to determine whether Plaintiff was disabled, Unum identified sedentary as the relevant exertion category. (*See id.* at 112). Then, Unum seemingly rejects the definition being used, insisting upon the occupation demands of certain jobs within the broader sedentary category. (*See id.* at 111). For example, when Plaintiff's vocational expert provides his findings, Unum appears to insist upon the specifics of the sedentary occupations it has provided. (*Id.*). It offers no justification nor authority for this new requirement. Although Unum does not totally ignore the Functional Capacity Evaluation—which would, in part, support a finding of arbitrary and capricious decision-making—it essentially commits the same error in substance, if not in form.

In *Bowers*, this Court found the plan administrator's decision arbitrary and capricious, in part, based on the failure of the Plan to consider the Functional Capacity Evaluation. *Bowers v. Hartford Life & Acc. Ins. Co.*, No. 2:09-CV-290, 2010 WL 1963412, at *1 (S.D. Ohio May 17, 2010) (Marbley, J.) There, the file reviewing doctor "merely mentions … but does not identify

his reasons for disagreeing with [the] findings" of the FCE.  Accordingly, this Court found that the file reviewer ignored the FCE "without explanation." *Bowers*, 2010 WL 1963412, at *7.  Similar to *Bowers*, the plan acknowledges the FCE, but does not provide adequate reasons for its disagreement. Accordingly, when the reason is wholly deficient, this is substantially no different than failing to give a reason.

For instance, Defendant asked one of Plaintiff's treating physicians—Dr. Natalie—if Plaintiff could satisfy the following occupational demands on a full-time basis:

> At this time, we need clarification regarding Sepanta Jalali's work capacity within the following occupational demands:
>
> - Exerting up to 10 pounds of force occasionally and/or negligible amount of force frequently to lift, carry, push or otherwise move objects, including the human body.
> - Sedentary work involves sitting most of the time, but may involve walking, standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met. Ability to change positions as needed throughout the work day.

(ECF No. 13-7 at 52).  Notably, when omitting the impermissible language at the end of the second bullet point ("[a]bility to change positions as needed throughout the work day"), the FCE appears to address all of these previously identified occupational demands.  As a threshold matter, the FCE opines that Plaintiff is "unable to perform all material handling tasks," i.e., lifting, carrying, "with at least 10 lb."  (ECF No. 13-8 at 70).  Additionally, the FCE addresses Plaintiff's ability to sit. Specifically, it states that Plaintiff was "unable to tolerate uninterrupted sitting for more than approximately 20 minutes."  (*Id.*).  Thus, absent additional explanation in its denial letter, it appears the Defendant is, again, attempting to import a new standard for disability into its Plan.

Moreover, the fact that Defendant offers a different reason in briefing than the one given at denial to defend its position does not change this result. Indeed, the Sixth Circuit has instructed that reviewing courts examine "not only the insurer's conclusion, but also its reasoning." *Metro.*

*Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007).  Accordingly, "[a]lthough the Administrator enjoys interpretive latitude, we defer only to its actual interpretations," or the reasons given when denying benefits.  *See Corey v. Sedgwick Claims Mgmt. Servs., Inc.*, 858 F.3d 1024, 1028 (6th Cir. 2017) (citing *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 848 n.7 (6th Cir. 2000)).  As a consequence, plans may not "rely on an attorney to craft a post-hoc explanation." *Id.*

Taken together, this lack of adequate explanation regarding its decision to minimize and disregard the FCE supports a finding that the denial of benefits was arbitrary and capricious.

### iii.    Dr. Lin's Opinion

Plaintiff argues that Defendant impermissibly relied on the opinions of Dr. Lin in his Independent Medical Exam (IME).  First, according to Plaintiff, Dr. Lin's report was riddled with errors and outright falsehoods.  (ECF No. 16 at 24).  Plaintiff, herself a trained doctor, disputes the findings of Dr. Lin by way of affidavit.  (*See id.*).  Moreover, Plaintiff asserts that Mr. Secrest—Plaintiff's consulting Functional Capacity Evaluator—also found inconsistencies between the FCE he performed and Dr. Lin's IME.  (*Id.*).  Further, Dr. Minard—Plaintiff's consulting physician who performed the IME she offered—asserted that Dr. Lin relied on outdated methods when examining Plaintiff's credibility.  (*See id.*).  Finally, Plaintiff says, Mr. Phillips—Defendant's Lead Appeals specialist—ignored Plaintiff's challenges, objections, and assertions concerning Dr. Lin's bias in his report.  (*Id.*).  Relying on *Love v. Nat'l City Corp. Welfare Benefits Plan*, she asserts that not responding to evidence renders Defendant's opinion arbitrary and capricious.  (*Id.*) (citing 574 F.3d 392, 397 (7th Cir. 2009)).

Defendant retorts by asserting it acknowledged Plaintiff's proffered critiques, but in their view the evidence overwhelmingly supported their decision to terminate benefits.  (ECF No. 19 at

31).  Indeed, according to Defendant, they acknowledged Plaintiff's concerns about Dr. Lin.  (*Id.*).

Yet, Defendant maintains, notwithstanding those concerns, Plaintiff's own treating providers had

findings consisted w/Dr. Lin's.  (*Id.* at 32).  Moreover, Defendant asserts that it acknowledged the

inconsistencies between Mr. Secrest's FCE and Dr. Lin's IME report.  (*Id.*).  Further, Defendant

contends, the Waddell signs that Dr. Minard asserts are outdated had little to do with their decision

to terminate benefits.  (*Id.* at 31).  Finally, Plaintiff demonstrates no basis to support her assertion

that Dr. Lin is biased.  (*Id.* at 32).  Defendants appear to be saying that such critiques absent

evidentiary support do not require a response.  (*See id.*)

The Sixth Circuit has recognized, "as a general matter, that when a plan administrator relies

on the opinion of one doctor over … another, the plan administrator's decision cannot be said to

have been arbitrary and capricious because it would be possible to offer a reasoned explanation …

for the plan administrator's decision." *Hayden v. Martin Marietta Materials, Inc. Flexible Benefits

Program*, 763 F.3d 598, 607 (6th Cir. 2014) (internal quotations omitted) (citing *McDonald*, 347

F.3d at 169.)  That said, "ERISA does not grant to a plan administrator carte blanche to adopt the

opinions of its reviewing physicians." *Id.*  Specifically, "[w]hen a reviewing physician's report is

"inadequate," a plan administrator cannot be said to engage in a deliberate, principled reasoning

process when it adopts the position of that report." *Id.* (citing *Kalish v. Liberty Mut./Liberty Life

Assur. Co. of Bos.*, 419 F.3d 501, 507 (6th Cir. 2005)).

Yet, the Sixth Circuit also recognizes the proposition that the opinions of treating doctors

need not be accorded any special weight by the administrator.  That is because, in part, those

doctors have no inherent reason for being more credible than other medical professionals.  Indeed,

it is also recognized that some treating doctors have drifted toward another extreme—that of

disability advocate. *White v. Standard Ins. Co.*, 895 F. Supp. 2d 817, 848 (E.D. Mich. 2012), *aff'd*,

529 F. App'x 547 (6th Cir. 2013). Indeed, this feature of ERISA litigation has surfaced with enough regularity that courts have recognized "that it is not necessarily arbitrary or capricious for a plan administrator to prefer the opinion of a non-treating medical professional over that of a claimant's treating physician, even where the former rests upon a review of the medical record rather than direct examination of the claimant." *Mellian v. Hartford Life & Accident Ins. Co.*, 161 F. Supp. 3d 545, 562 (E.D. Mich. 2016). Thus, it is not surprising that many of Plaintiff's assertions on this subject are either without case citations altogether or urges this Court to consider an approach of another circuit.

Accordingly, the issues Plaintiff raises with Dr. Lin as a provider of IMEs do not demonstrate that he is biased. Further, those same issues are insufficient to support the conclusion that Defendant's reliance on Dr. Lin's report, on its own, renders its decision arbitrary and capricious. Instead, Dr. Lin's opinion is problematic because he uses the same improper standard that Defendant provided for each expert offering an opinion: whether Plaintiff was totally disabled ***even if her disability could be reasonably accommodated***. The inclusion of this additional reasonable accommodation consideration is an impermissible interpretation of the Plan. Thus, it is for this reason that Dr. Lin's opinion supports the conclusion that Defendant's decision was arbitrary and capricious.

### iv. Plaintiff's Evidence

Plaintiff argues that Defendant failed to credit properly four sources of evidence: (1) the Functional Capacity Evaluation (FCE); (2) Dr. Minard's Independent Medical Exam; (3) Mr. Atkinson's vocational exam; and (4) Plaintiff's own affidavit. (ECF No. 16 at 22–23). First, Plaintiff reasserts its earlier argument about its proffered FCE. (*Id.* at 22). Next, Plaintiff argues that Defendant improperly interpreted Dr. Minard's independent medical exam (IME). (*Id.*).

Third, according to Plaintiff, Defendant also misinterpreted Mr. Atkinson's vocational report, particularly by stating that Mr. Atkinson failed to address why Plaintiff could not do alternate sedentary jobs. (*Id.* at 23). Finally, Plaintiff maintains that her affidavit was wholly ignored by Defendant and this alone is arbitrary and capricious. (*Id.*) (citing *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1120 (10th Cir. 2006) and *Diaz v. Prudential Life Ins. Co. of America*, 499 F.3d 640, 645 (7th Cir. 2007)).

Defendant responds by denying each of Plaintiff's assertions. First, Defendant argues, it did consider Plaintiff's FCE; it was, however, inconsistent with Dr. Lin's independent medical exam (IME). (ECF No. 19 at 30). Second, according to Defendant, it did not discount Dr. Minard's exam because of timeliness, but rather because this exam was inconsistent with Dr. Lin's findings as well as Plaintiff's own treating physicians' findings. (*Id.* at 30–31). Moreover, Defendant contends, Defendant did not misinterpret Dr. Minard's exam; rather, it properly considered alternative reasoning for Plaintiff's purported "gait issues." (*Id.* at 29–30). Further, Defendant maintains, the vocational report offered by Mr. Atkinson did, in fact, fail to address whether Plaintiff could do other sedentary jobs. (*Id.* at 30). Finally, Defendant did consider Plaintiff's affidavit, but only as it related to Dr. Lin's exam: that was, after all, the exam in which Plaintiff's affidavit responded. (*Id.* at 31 n.8).

Plan "administrators may not arbitrarily refuse to credit a claimant's reliable evidence." *Counts v. United of Omaha Life Ins. Co.*, 429 F. Supp. 3d 389, 404 (E.D. Mich. 2019) (citing *Black & Decker Disability Plan*, 538 U.S. at 825)) (internal quotations omitted). Likewise, "administrators [may not] "engage [ ] in a selective review of the administrative record to justify a decision to terminate coverage." *Id.* (citing *Metro. Life Ins.*, 474 F.3d at 265 (internal quotation marks omitted). Further, a plan administrator's decision may be held arbitrary and capricious

when it offers "no explanation as to why only the alleged evidence favorable to the denial of service credit warrants credence, and why the evidence favorable to the award of credit, is ignored." *Reid v. Int'l Painters & Allied Trades Indus. Pension Plan*, 358 F. Supp. 3d 714, 726 (S.D. Ohio 2019).

Throughout the Defendant's denial letter, much is made of Plaintiff's treating physicians' opinions, particularly that of Dr. Natalie. Indeed, Defendant described Dr. Natalie's opinion "represented a significant change in the available medical evidence related to Dr. Jalali's work capacity." (ECF No. 13-9 at 105). In fact, based on Dr. Natalie's opinion, Defendant declared that "[a]s of May 31, 2017 … Dr. Jalali[] … had the physical ability to work on a full-time basis." (*Id.*). Moreover, the Defendant notes that "[a]s the medical provider treating Dr. Jalali's back pain [Dr. Natalie's] opinion is given significant weight." (*Id.* at 107). The remainder of Defendant's denial letter weaves in the opinions of its consulting physicians and other reviewers, never missing the opportunity to point to Dr. Natalie's opinion to demonstrate the strength of its own. (*See e.g.*, *Id.* at 108) ("Dr Natalie's opinion is consistent with conclusions of the Benefits Center's physician and our physicians review on appeal.").

Recalling that Dr. Natalie's opinion is based on the improper consideration of Jalali's ability to work with a reasonable accommodation, Defendant's position and reliance on Plaintiff's treating physicians becomes much less robust. Indeed, it even offers an interesting concession concerning Plaintiff's medical condition:

> Dr. Jalali's history of prior back surgeries and diagnostic imaging is consistent with moderate degenerative changes in her lumbar spine and would result in some postural and strength limitations. However, these limitations would not ***preclude the performance of sedentary work with the ability to change position on an as needed basis.***

(*Id.* at 109) (emphasis added). One need not look much further than this acknowledgment of Jalali's condition to determine why Defendant routinely discounted Plaintiff's evidence, relies on its consulting reviewers, and used Dr. Natalie's skewed opinion as a benchmark for its own physicians. The inclusion of the bolded and italicized excerpt above again demonstrates that Defendant's reason for discounting Plaintiff's evidence was the impermissible addition of the reasonable accommodation requirement. Because this reason must itself be discounted, it is as if Defendant gave no reason at all. Accordingly, when a plan administrator offers "no explanation as to why only the alleged evidence favorable to the denial of service credit warrants credence, and why the evidence favorable to the award of credit, is ignored," that is a basis for finding that decision arbitrary and capricious. *Reid*, 358 F. Supp. 3d at 726.

Taken together, Defendant's decision to deny Plaintiff's long-term benefits cannot be said to be the result of "a deliberate, principled reasoning process supported by substantial evidence." *Id.* Thus, Defendant's decision was arbitrary and capricious.

### D. Remedy

Plaintiff requests that the Court: (1) order Unum to reinstate her benefits from the date of denial to the date of judgement; and (2) subject Unum to a new heightened standard before they may deny her benefits, if at all, in the future. (ECF No. 16 at 28).

Plaintiff seeks reinstatement of her benefits from the date of termination going forward, including interest that would've accrued according to Ohio's statutory rate. (*Id.* at 29). And although reinstating benefits is a routine remedy for benefits denials, Plaintiff concedes that seeking determination of future rights is less so. (*Id.* at 28–29). Plaintiff, however, urges this result because of her history with Defendant. Indeed, according to Plaintiff, her disability benefits have been terminated or reduced four times over the past decade. (*Id.* at 30). Because they have

been restored each of the past three times, and she asserts they should be restored here, additional safeguards should be provided to Plaintiff. (*See id.*). Plaintiff argues that the next time Defendant attempts to deny her benefits, they should be required to demonstrate that she is not disabled under what she describes as a "reasonable and objective evidence" standard. (*Id.*).

Defendant responds first by contending that an argument about a remedy is unnecessary because Plaintiff is not entitled to any remedy. (ECF No. 19 at 37). Moreover, Defendant says, that even if Plaintiff was entitled to some remedy, the type she seeks is neither appropriate nor supported by Sixth Circuit case law. (*See id.*). Defendant maintains Courts may award retroactive benefits on the basis that a termination of benefits was arbitrary and capricious. (*Id.*). Yet, courts, according to Defendant, do not award future benefits because that would, in effect, alter the terms of the Plan. (*Id.* at 38). Defendant, also argues, that the Plan, as written, requires the Plaintiff to show disability in the first instance as well as upon continuing review. (*See id.*). Adding the new standard Plaintiff requests would impermissibly reverse that burden. (*Id.*).

Having found that Unum's termination of benefits was arbitrary and capricious, the Court turns to the proper remedy. Generally, "courts may either award benefits to the claimant or remand to the plan administrator." *Elliott*, 473 F.3d at 621. A remand to the plan administrator is appropriate "where the problem is with the integrity of the plan's decision- making process, rather than that a claimant was denied benefits to which he was clearly entitled." *Id.* at 622; *see also Kalish*, 419 F.3d at 513 (concluding that where claimants have clearly established their disability, the appropriate remedy is an immediate award of benefits rather than a remand to consider previously ignored evidence). As the Sixth Circuit has warned, "[p]lan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 172 (6th Cir. 2007). Instead, "[t]hey

need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable." *Id.*

Here, Jalali's underlying medical records and opinions from her IME, FCE, and vocational expert all indicate that she was totally disabled under the plan's plain language. Similar to the underlying facts of *Haning*—where an administrator initially found the claimant totally disabled "but subsequently terminated them as a result of an arbitrary and capricious decision—one that relied on a selective … reading of the evidence"—it is appropriate to award retroactive benefits. *Haning*, 140 F. Supp. 3d at 676 (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000) and *Rohr v. Designed Telecommunications, Inc.*, No. 2:08-CV-345, 2009 WL 891739, at *12 (S.D. Ohio Mar. 30, 2009)).

That all of Defendant's reviewers relied on an improper—frankly more rigorous—standard for determining disability militates toward discounting their opinions that Plaintiff could return to work. Moreover, the plan administrator's decision that Plaintiff was no longer disabled is further weakened by the fact that Defendant attempted to bolster its own consulting reviewers' opinions by bootstrapping: they first solicited an opinion from Plaintiff's treating physicians based on an improper standard then used that same infirm opinion to reinforce its own thoughts about Plaintiff's disability status. Perhaps just as damning, the Defendant offers what appears to be a thinly veiled concession:

> Dr. Jalali's history of prior back surgeries and diagnostic imaging is consistent with moderate degenerative changes in her lumbar spine and would result in some postural and strength limitations. However, these limitations would not ***preclude the performance of sedentary work with the ability to change position on an as needed basis.***

(*Id.* at 109) (emphasis added).  Thus, Defendant's own conclusion appears to be that but for this reasonable accommodation, Jalali could not meet the demands of a sedentary occupation.

"Under these circumstances, and because [Jalali] was clearly entitled to disability benefits, a retroactive award is warranted." *Haning*, 140 F. Supp. 3d at 676 (citing *Williams v. Int'l Paper Co.*, 227 F.3d 706, 715 (6th Cir. 2000); *Rohr v. Designed Telecommunications, Inc.*, No. 2:08-CV-345, 2009 WL 891739, at *6 (S.D. Ohio Mar. 30, 2009).

Further, although "ERISA does not address the propriety of awarding prejudgment interest, prejudgment interest may be awarded in the discretion of the district court. Awards of prejudgment interest are compensatory, not punitive, and a finding of wrongdoing by the defendant is not a prerequisite to such an award." *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 376 (6th Cir. 2015) (citing *Tiemeyer v. Cmty. Mut. Ins. Co.*, 8 F.3d 1094, 1103 (6th Cir. 1993), *cert. denied*, 511 U.S. 1005 (1993) (internal quotations and citations omitted) and *Wells v. U.S. Steel*, 76 F.3d 731, 737 (6th Cir. 1996)).

District courts consider the following factors when determining whether a claimant is entitled to an award for prejudgment interest: (i) Plaintiff's loss of the use of the money; (ii) the extent of injury; (iii) the rate of inflation over the period Plaintiff was deprived of the money; (iv) the increase in the cost of living; (v) and other potential measures of economic injury; (vii) and the Plan's enrichment resulting from the use of the money.  *See Mulder v. Loc. 705, Int'l Bhd. of Teamsters, Pension Fund*, 794 F. App'x 451, 456 (6th Cir. 2019) (citing *Drennan v. General Motors Corp.*, 977 F.2d 246, 253 (6th Cir. 1992)). Because the parties do not effectively address this issue, the Court, and the parties would benefit from additional briefing.  Accordingly, additional briefing is ordered solely to address whether this Court should, in its discretion, award prejudgment interest to Plaintiff.

Importantly, "[t]he Court recognizes, however, that the terms of the Plan permit [Unum] to require continued proof of [Jalali's] disability for her benefits to continue and that, as of this date, her continued disability must relate only to "any occupation." This opinion does not limit the applicability of those provisions." *Haning*, 140 F. Supp. 3d at 676. Accordingly, this Court **DENIES** Plaintiff's request to have Unum pay her benefits subject to a heightened standard of denial: Defendant would need to show with reasonable and objective evidence that she is not disabled.  Instead, she is **GRANTED** the ordinary remedy: her benefits retroactive to the date of denial.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment on the Administrative Record (ECF No. 19) is **DENIED** and Plaintiff's Motion (ECF No. 16) is **GRANTED IN PART**.  Plaintiff is **GRANTED** benefits retroactive to the date of termination: February 14, 2018.  Simultaneous briefing is due within 21 days of this opinion, solely to address the issue of whether Plaintiff is entitled to an award of prejudgment interest.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE:  March 28, 2022**